## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Medical Students for Choice<br>　　P.O. Box 40935<br>　　Philadelphia, PA 19107<br><br>Natasha Reifenberg<br>　　University of Notre Dame<br>　　Notre Dame, IN 46556<br><br>Jane Doe<br>　　University of Notre Dame<br>　　Notre Dame, IN 46556<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>DON J. WRIGHT, in his official capacity as Acting<br>Secretary of Health and Human Services<br>　　200 Independence Ave. SW<br>　　Washington, DC 20201<br><br>R. ALEXANDER ACOSTA, in his official capacity<br>as Secretary of Labor<br>　　200 Constitution Ave. NW<br>　　Washington, DC 20210<br><br>STEVEN T. MNUCHIN, in his official capacity as<br>Secretary of the Treasury<br>　　1500 Pennsylvania Ave. NW<br>　　Washington, DC 20220<br><br>　　　　　　Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT**<br>**FOR INJUNCTIVE AND**<br>**DECLARATORY RELIEF** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, by and through their undersigned counsel, bring this complaint against

Defendants, their agents and successors in office, and in support aver the following:

## INTRODUCTION

1.　　This is a challenge to interim final rules promulgated by the Departments of Health and Human Services, Labor, and Treasury (the Departments) that will cause thousands of women, including Natasha Reifenberg, Jane Doe, and members of Medical Students for Choice (collectively, the Plaintiffs), to lose meaningful access to contraception services in violation of the Administrative Procedure Act and the First and Fifth Amendments to the U.S. Constitution.

2.　　Over the course of her lifetime, the average woman in the United States will have approximately two children. This means that she will spend close to three years pregnant, post-partum, or trying to become pregnant, and about three *decades* trying to avoid an unintended pregnancy. It is therefore unsurprising that 99% of the 53 million women of reproductive age in the United States who have had sexual intercourse report having used at least one method of birth control. Contraception is essential to the health and economic stability of women—allowing them to time and space their pregnancies, pursue educational and career opportunities, and thereby enhance their economic security and that of their families.

3.　　The Patient Protection and Affordable Care Act of 2010 ("ACA") requires group health plans and health insurance issuers (hereinafter "health insurance plans") to cover—without cost-sharing—a wide variety of preventive health services. Recognizing that women have historically been required to pay more money out-of-pocket for preventive services than men, Congress expressly required the inclusion of women's preventive services among those services that health insurance plans must provide without cost. Since 2011, the Departments' controlling regulations have clarified that these services must include contraception and related counseling services. They also implemented an "exemption" that excludes certain religious institutions from the contraceptive coverage requirement and an "accommodation," which

2

protects the interests of other employers and universities that object to contraception on religious grounds, while simultaneously ensuring that women who receive insurance through these entities retain access to seamless contraceptive care.

     4.     On October 6, 2017, with total disregard for the Administrative Procedure Act's ("APA") procedural safeguards, the Departments issued two interim final rules, the Moral Exemptions Rule[1] and the Religious Exemptions Rule,[2] collectively, "the Rules" or "the Interim Final Rules," which effectively *exempt* from the ACA's generally applicable coverage requirement almost *any* entity, including businesses, non-profits, and universities, that objects on religious or moral grounds to contraception.  In doing so, the Departments jettisoned the careful balance that they had previously struck—with input from hundreds of thousands of commenters and numerous courts—between women's need for a critical preventive service and certain institutions' religious beliefs.  And they did so without any statutory authority or even a reasoned explanation.  Moreover, by making the Rules effective immediately the Departments dispensed with the notice and comment period required under the APA, and did so without good cause. For these reasons alone, the Rules must be vacated.

     5.     The Rules are also unconstitutional.  The Establishment Clause of the U.S. Constitution prohibits the government from creating exemptions to neutral, generally applicable rules in a manner that imposes significant burdens on third-parties.  But that is precisely what the Rules do by shifting the burden of securing contraception, an essential healthcare service, onto

---

[1] *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, __ Fed. Reg. __ (public inspection version issued Oct. 6, 2017), https://s3.amazonaws.com/public-inspection.federalregister.gov/2017-21852.pdf.

[2] *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, __ Fed. Reg. __ (public inspection version issued Oct. 6, 2017), https://s3.amazonaws.com/public-inspection.federalregister.gov/2017-21851.pdf.

3

the contraceptive coverage requirement's intended beneficiaries:  namely, employees and students.

6.      Finally, the Rules violate women's Fifth Amendment rights to equal protection and to reproductive freedom.  The Rules permit objectors to target for exclusion an essential benefit that is only used by women and that the Constitution affords special, protected status given its unique role in ensuring women's autonomy and equality.

7.      For these reasons, and others described below, this Court should vacate the Interim Final Rules and enjoin the Departments from enforcing them in the future.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1346(a)(2) and 1361 over Plaintiffs' claims under the U.S. Constitution, and 5 U.S.C. § 706 over Plaintiffs' claims under the APA.  Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

9.      Venue is proper under 28 U.S.C. §§ 1391(b)(2) and 1391(e).  Defendants are officers or employees of the United States acting in their official capacities, and agencies of the United States.

## PARTIES

10.      Plaintiff Medical Students for Choice is a not-for-profit organization composed of individual members organized into chapters at medical school campuses and residency programs across the country, and globally.  Medical Students for Choice is dedicated to ensuring that medical students and residents receive training in best practices in the provision of reproductive and sexual healthcare.  The organization advocates to make comprehensive reproductive healthcare, including abortion care, a standard part of medical school education and residency training.  In addition, Medical Students for Choice seeks to ensure that women receive the full

4

range of reproductive health choices, and to empower individuals to make their own reproductive

healthcare decisions free of stigma, judgment, and barriers. Members of Medical Students for

Choice work and study at a broad range of institutions across the United States, including at

religiously-affiliated universities and hospitals that have chosen to use the existing regulatory

accommodation and are likely to take the expanded exemption created by the Rules. Medical

Students for Choice sues on behalf of its members.

11.     Plaintiff Natasha Reifenberg is an undergraduate student at the University of

Notre Dame. Plaintiff Reifenberg receives health insurance coverage through the University of

Notre Dame's faculty insurance plan, and relies on her insurance plan for all of her healthcare

needs. Ms. Reifenberg has used hormonal birth control in the past, and plans to use her

insurance coverage to obtain a long-acting, reversible form of contraception. Ms. Reifenberg's

ability to pursue her educational and professional goals; to participate in the academic, social,

cultural, and extracurricular activities available to university students; and to secure her own

financial well-being depend on her continued ability to access reliable and affordable birth

control.

12.     Plaintiff Jane Doe is an undergraduate student at the University of Notre Dame.

Plaintiff Doe receives health insurance coverage through the University of Notre Dame's faculty

insurance plan, and relies on her insurance plan for all of her healthcare needs. Ms. Doe uses

hormonal birth control both for non-contraceptive purposes and to prevent unintended

pregnancy, and intends to continue using her insurance coverage to obtain birth control. Ms.

Doe's ability to pursue her educational and professional goals; to participate in the academic,

social, cultural, and extracurricular activities available to university students; and to secure her

own financial well-being depend on her continued ability to access reliable and affordable birth control.

13.     Defendant Don J. Wright is the Acting Secretary of the United States Department of Health and Human Services ("HHS"). In this capacity, he has responsibility for the operation and management of HHS. Defendant Wright is sued in his official capacity.

14.     Defendant R. Alexander Acosta is the Secretary of the United States Department of Labor ("DOL"). In this capacity, he has responsibility for the operation and management of DOL. Defendant Acosta is sued in his official capacity.

15.     Defendant Steven T. Mnuchin is the Secretary of the United States Department of Treasury ("Treasury"). In this capacity, he has responsibility for the operation and management of the Treasury. Defendant Mnuchin is sued in his official capacity.

## FACTUAL ALLEGATIONS

### I.     The Contraceptive Coverage Benefit Promotes Women's Health and Equality.

16.     According to the Centers for Disease Control and Prevention ("CDC"), the development of safe and effective contraception was one of the ten greatest public health achievements of the 20th century.[3]  Access to birth control has been central to improving women's health and that of their families and has given women the ability to "participate equally in the economic and social life of the Nation."[4]

---

[3] CDC, *Ten Great Public Health Achievements—United States*, 1900-1999, MMWR, Morbidity and Mortality Weekly Report, Apr. 2, 1999, https://www.cdc.gov/mmwr/preview/mmwrhtml/00 056796.htm.

[4] *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2787 (2014) (Ginsburg, J., dissenting) (quoting *Planned Parenthood Se. Pa. v. Casey*, 505 U.S. 833, 856 (1992)).

6

17.    Approximately 53 million women of reproductive age in the United States have had sexual intercourse and 99% of these women report having used at least one method of contraception.  Approximately 88% of all women of reproductive age who have had sexual intercourse have used a highly effective, reversible method of contraception.[5]

18.    The widespread use of contraception among U.S. women includes women who identify as religious.  A 2011 report found that, among all Catholic women who have had sex, 98% have used some form of modern contraception at some point in their lives.  In fact, more than two-thirds of sexually active women "of all denominations" use highly effective methods of contraception such as sterilization, the birth control pill, or an intra-uterine device ("IUD").  Moreover, women report that the "importance of religion to [their] daily life" is "largely unrelated to [their] use of highly effective contraceptive methods."[6]

### A. Contraception Helps Prevent Unplanned Pregnancy and Has Other Important Benefits to Women's Health.

19.    As previously mentioned, the average woman in the United States will have two children.  Thus, in her lifetime, she will spend close to three years pregnant, post-partum, or trying to conceive, and about three decades trying to avoid unintended pregnancy.[7]

---

[5] Kimberly Daniels, et al., *Contraceptive Methods Women Have Ever Used: United States, 1982–2010*, National Health Statistics Reports No. 62, 1 (Feb. 14, 2013), http://www.cd c.gov/nchs/data/nhsr/nhsr062.pdf.

[6] Rachel K. Jones & Joerg Dreweke, Guttmacher Institute, *Countering Conventional Wisdom: New Evidence on Religion and Contraceptive Use* (2011), https://www.guttmacher.org/ sites/default/files/report_pdf/religion-and-contraceptive-use.pdf.

[7] Guttmacher Institute, *Fact Sheet: Unintended Pregnancy in the United States* (Sept. 2016), https://www.guttmacher.org/fact-sheet/unintended-pregnancy-united-states#1a.

20. It is estimated that 89% of sexually active women not using a contraceptive method will become pregnant within a year.[8] As recently as 2001, almost half of all pregnancies in the United States were unintended.[9] But unintended pregnancies are disproportionately experienced by young women aged 18 to 24, unmarried women, minorities, and women who are poor and low-income.[10]

21. Unplanned or unintended pregnancy can lead to a number of adverse outcomes, including increased risks to a woman's health and that of her child. Women facing unintended pregnancy "are more likely than those with intended pregnancies to receive later or no prenatal care, to smoke and consume alcohol during pregnancy, to suffer from prenatal depression, and to experience domestic violence during the pregnancy."[11] Women who have carried an unwanted pregnancy to birth report experiencing higher levels of depression and lower levels of happiness.[12] Unintended pregnancy is also associated with an increased risk of preterm birth and relatively low birth weight, as compared with intended pregnancies.[13]

22. Pregnancy itself can also exacerbate underlying physical and psychological conditions, or trigger the onset of a serious illness or health condition. Women who experience chronic medical conditions such as obesity or diabetes may need to take particular care in planning their pregnancies to ensure that their health can support a pregnancy to term. Other

---

[8] Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps* ("IOM Report") at 91-92 (2011).

[9] *Id.* at 102.

[10] *Id.*

[11] *Id.* at 103.

[12] *Id.*

[13] *Id.*

conditions, such as pulmonary hypertension and cyanotic heart disease are contraindicated for pregnancy. Lack of access to contraceptive services places these women's health and their lives at significant, sustained risk.[14]

23. Many women also rely on contraception for non-contraceptive health reasons. For example, about one in ten women of reproductive age is affected by endometriosis, and hormonal birth control pills can help slow the growth of endometrial tissue, prevent the formation of new adhesions, and reduce associated pain.[15] Contraceptives can also be used to treat other types of pelvic pain, acne, menstrual migraines, and other conditions.[16] And long-term use of contraceptives may reduce the risk of endometrial cancer and ovarian cancer, and protect against pelvic inflammatory disease and some breast diseases.[17]

### B. Access to Contraception Supports Women's Educational and Professional Advancement.

24. In addition to offering numerous health benefits, access to contraception fosters women's educational and professional opportunities. The Departments have explicitly acknowledged these far-reaching and long-lasting benefits, noting that prior to the ACA's passage, disparities in healthcare coverage "place[d] women in the workforce at a disadvantage compared to their male co-workers," and that the contraceptive coverage benefit "furthers the goal of eliminating this disparity by allowing women to achieve equal status as healthy and productive members of the job force." Group Health Plans and Health Insurance Issuers

---

[14] *Id.* at 103-04.

[15] American College of Obstetricians and Gynecologists, Noncontraceptive Uses of Hormonal Contraceptives, Obstetrics & Gynecology (Practice Bulletin No. 110, 2010).

[16] IOM Report at 107; *see* Daniels, et al., *supra.* n.5, at 3-4.

[17] IOM Report at 107.

9

Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8728 (Feb. 15, 2012).

25.     In the 1960s, widespread access to oral contraceptives significantly improved women's ability to invest in higher education. For instance, in the 1960s, only 1% of first year dentistry students were women but by 1980, that number had increased to 19%. During the same time period, the percentage of female first-year medical students tripled from 10% to 30% and the percentage of female law students climbed from 4% to 36%.[18] Indeed, access to oral contraceptives may account for up to one-third of the increase in college enrollment by women in the 1970s.[19]

26.     Large increases in women's presence in law, medicine, and other professions soon followed. The percentage of female attorneys and judges more than doubled between the 1970s and 1980s. The proportion of female physicians, too, increased by one-and-a-half times between 1970 and 1980, with similar increases among other professions including engineers, economists, and architects.[20] Moreover, one third of the narrowing of the hourly gender wage gap in the 1990s can be attributed to women's contraceptive use.[21] In sum, research has "shown that access to contraception improves the social and economic status of women." 77 Fed. Reg. 8725.

---

[18] Claudia Goldin & Lawrence F. Katz, *The Power of the Pill: Oral Contraceptives and Women's Career and Marriage Decisions,* 110 J. of Pol. Econ. 730, 749 (2002), https://dash.har vard.edu/handle/1/2624453.

[19] Heinrich H. Hock, *The Pill and the College Attainment of American Women and Men* 19 (Fla. State Univ., Working Paper 2007).

[20] Goldin & Katz, *supra* n. 18, at 749.

[21] Martha J. Bailey, et al., *The Opt-In Revolution? Contraception and the Gender Gap in Wages*, 26-27 (Nat'l Bur. of Econ. Research, Working Paper 17922, May 13, 2012), http://www-personal.umich.edu/~baileymj/Opt_In_Revolution.pdf.

10

II.    **The ACA Was Intended to Improve Women's Preventive Health Services.**

      A. **Congress Adopted the Women's Health Amendment to Remedy Disparities in Women's Healthcare Coverage.**

    27.    To improve the health of Americans and decrease the overall cost of healthcare, the ACA requires health plans to cover certain preventive health services without cost-sharing. 42 U.S.C. § 300gg-13(a). Early versions of the ACA included no provisions regarding women's health. To address this oversight, Congress adopted the Women's Health Amendment, which was intended to "expand the screening and preventive services available to women" and curtail the "punitive practices" of insurance companies "that charge women more and give [women] less in a benefit." 155 Cong. Rec. S. 12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski).[22] The Amendment sought to ensure that women receive the essential benefits of early detection and preventive services, thereby reducing health impairments, "sav[ing] lives," and allowing women to in the long run, "save[] money." 155 Cong. Rec. S11,988 (daily ed. Nov. 30, 2009) (Amend. No. 2791).

    28.    To achieve these goals, the Women's Health Amendment added a new category of preventive care to be covered at no cost-sharing, providing that "with respect to women," health plans must cover "such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph." *Id.* at 11,986-87; *see* 42 U.S.C. 300-gg(13)(a)(4).

---

[22] *See also* 155 Cong. Rec. S. 12,027 (2009) (statement of Sen. Gillibrand) ("[T]oo many women [were] delaying or skipping preventive services because of the costs of copays and limited access.").

## B. The HRSA Guidelines Identify Preventive Services That are Necessary to Ensure Women's Health and Well-Being.

29.     The ACA directed the Health Resources and Services Administration ("HRSA"),

an agency within HHS focused on improving healthcare for vulnerable populations, to develop a

list of covered preventive services for women.  To fulfill this statutory mandate, HRSA

commissioned the Institute of Medicine ("IOM"), an arm of the National Academy of Sciences,

Engineering and Medicine, "to review what preventive services are necessary for women's

health and well-being," "identify existing coverage gaps," and make recommendations "for HHS

to consider in order to fill those gaps."[23]

30.     In July 2011, the IOM published its report, authored by a diverse panel of experts,

including medicine and public health researchers and practitioners, many of whom serve as

distinguished faculty members at prestigious public health and medical schools throughout the

country.[24]  The IOM report further benefitted from the review of 11 additional researchers and

scientists based at institutions such as Harvard Medical School and the Bloomberg School of

Public Health at Johns Hopkins University.  These independent reviewers "provide[d] candid

and critical comments . . . to ensure that the report [met] institutional standards of objectivity,

evidence, and responsiveness to the study charge."[25]

31.     Based on its thorough review of policies, practices, and public health research, the

IOM recommended no-cost coverage for services that met three criteria: (1) "The condition to be

prevented affects a broad population;" (2) "The condition to be prevented has a large potential

---

[23] IOM Report at 21.

[24] *Id.* at 20, 21, 23.

[25] *Id.* at vii.

impact on health and well-being;" and (3) "The quality and strength of the evidence is supportive."[26]

32.     With respect to contraception and family planning services in particular, the IOM committee found that 36 million U.S. women are "in need" of family planning services because they fit three criteria: (1) they are sexually active; (2) able to become pregnant; and (3) are not trying to get pregnant.[27]

33.     Next, it determined that "[s]ystematic evidence reviews and other peer-reviewed studies provide evidence that contraceptive counseling are effective at reducing unintended pregnancies" and that "[n]umerous health professional associations recommend family planning services as part of preventive care for women."[28]

34.     The IOM found that "women need to use more preventive care than men, owing to reproductive and gender-specific conditions," and have historically spent more out-of-pocket money on healthcare.[29]  This disparity "creates a particular challenge [for] women, who typically earn less than men and who disproportionately have low incomes."[30]  The IOM concluded that HRSA should include the full range of contraceptives approved by the U.S. Food and Drug Administration as women's preventive care, and that "eliminat[ing] . . . cost sharing for contraception could … greatly increase its use, including the use of the more effective and longer-acting methods."[31]

---

[26] *Id*. at 77.

[27] *Id*. at 103.

[28] *Id*. at 104, 109.

[29] *Id.* at 19 (citation omitted).

[30] *Id.*

[31] *Id*. at 109.

35.     On August 1, 2011, HRSA adopted the IOM Report's recommendations in full,

and the Departments issued an interim final rule (the "August 2011 IFR") providing that,

consistent with other preventive services, insurance plans would be required to cover the

women's preventive services recommended by HRSA starting in the next plan year following

August 1, 2011. Accordingly, for many student health plans, coverage would go into effect for

plans beginning August 1, 2012. For insurance plans issued based on the calendar year,

coverage would go into effect for plans beginning January 1, 2013. 76 Fed. Reg. 46,621, 46,624

(Aug. 3, 2011).

### C. The ACA's Contraceptive Coverage Benefit Removed a Major Barrier to Women's Access.

36.     Before the ACA's contraceptive coverage requirement, cost barriers prevented

many women, including women with insurance, from accessing contraceptive services or from

using the method of contraception best suited to their healthcare needs.

37.     The IOM Report noted that, at the time of its publication, "[d]espite increases in

private health insurance coverage of contraception . . . many women [did] not have insurance

coverage or have health plans in which copayments . . . have *increased* in recent years."[32] A

roughly contemporaneous study reported that women with insurance coverage for oral

contraceptives spent 29% of their total out-of-pocket expenditures for health services on birth

control pills.[33] Moreover, long-acting methods of contraception, such as IUDs, were not

consistently covered by employer-sponsored health insurance plans. Even where insurers

---

[32] *Id.* at 109 (emphasis added.

[33] Testimony of Guttmacher Institute Submitted to the Committee on Preventive Services for Women, Institute of Medicine (2011), http://www.guttmacher.org/pubs/CPSW-testimony.pdf.

covered the costs of IUD placement, they did not necessarily cover the costs associated with removal of the device.[34]

38.     IUDs, which are effective for up to five years, can carry upfront costs of $500 to $1,000 for the device itself, not including the medical costs of the office visit and insertion.[35] For a woman earning the current federal minimum wage of $7.25 per hour, this amounts to nearly a full month's salary.

39.     Other long-acting methods like contraceptive implants carry upfront costs between $400 and $800, with additional fees for the cost of the exam and insertion. Implants must be re-inserted every three years.[36]

40.     As the IOM Report noted, these high upfront costs are a significant barrier to usage, especially for low-income women, and contribute to the lower rates of usage of highly effective, long-acting, reversible contraceptives.[37]

41.     Monthly hormonal methods such as the ring or the patch are more affordable upfront, but require monthly payments between $15 and $80, and carry a higher rate of failure.[38]

---

[34] Association of Reproductive Health Professionals, Quality of Healthcare Access for Women Survey (May 2004), http://www.arhp.org/Publications-and-Resources/Studies-and-Surveys/Healthcare-Access-Survey.

[35] Laurie Sobel, et al., Kaiser Family Foundation, *Coverage of Contraceptive Services: A Review of Health Insurance Plans in Five States* at 13 (Apr. 16, 2015), http://www.kff.org/report-section/coverage-of-contraceptive-services-coverage-of-select-contraceptive-methods/; David Eisenberg et al., *Cost as Barrier to Long-Acting Reversible Contraceptive (LARC) Use in Adolescents*, 52 J. Adolescent Health S59, S60 (2013).

[36] Sobel, et al., *supra* n.35, at 12.

[37] IOM Report at 108-09.

[38] Sobel, et al., *supra* n.35, at 9; Eisenberg, et al., *supra* n.34, at S60.

15

42.     Out-of-pocket costs for birth control pills—which can range from $15 to $80 per month (depending on whether the drug is covered as a generic or brand-name), excluding the cost of related doctor visits—may also be prohibitively expensive for some women.[39]

43.     The contraceptive coverage requirement removed these persistent cost-related barriers to contraceptive access, improving the ability of millions of women not only to afford contraception but also to choose the method best suited to their needs, regardless of cost. Additionally, the requirement made this coverage seamless, integrating contraceptive services with other preventive and primary care services. Seamless coverage allows women to receive contraceptive care and counseling from a trusted provider who is familiar with their medical history, family needs, and personal goals.

44.     Since the contraceptive coverage benefit took effect in August 2012, 55 million women have accessed no-cost contraceptive coverage.[40] These women have saved nearly $1.4 billion annually in out-of-pocket costs for oral contraceptives alone.[41] The steep decline in out-

---

[39] Center for American Progress, The High Costs of Birth Control: It's Not As Affordable As You Think (Feb. 15, 2012), https://www.americanprogress.org/issues/women/news/2012/02/15/ 11054/the-high-costs-of-birth-control/.

[40] Office of the Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services, The Affordable Care Act is Improving Access to Preventive Services for Millions of Americans (May 14, 2015), https://aspe.hhs.gov/pdf-report/affordable-care-act-improving-access-preventive-services-millions-americans. *See also* National Women's Law Center Fact Sheet, "New Data Estimates 62.4 Million Women Have Coverage of Birth Control Without Out-of-Pocket Costs," (Sept. 2017), https://nwlc.org/wp-content/uploads/2017/09/New-Preventive-Services-Estimates-3.pdf (estimating that a total of 62.4 million women have now been able to access no-cost contraceptive services under the ACA).

[41] Nora V. Becker & Daniel Polsky, *Women Saw Large Decrease in Out-of-Pocket Spending for Contraceptives After ACA Mandate Removed Cost Sharing*, 34 Health Affairs 1204, 1209 (July 2015), http://content.healthaffairs.org/content/34/7/1204.abstract.

of-pocket spending on oral contraceptive pills has accounted for 63% of the drop in total U.S. spending on prescription drugs.[42]

45.     By 2014, two-thirds of women using oral contraceptives were benefiting from no-cost contraceptive coverage, and almost three-quarters of women using the contraceptive ring were no longer paying out-of-pocket costs.[43]

46.     In addition to giving millions of women seamless coverage and substantial cost savings, the contraceptive coverage requirement has also significantly benefitted employers. Indeed, the Departments have previously noted that it is significantly cheaper for employers to provide contraceptive coverage than to cover the costs associated with pregnancy and related employee unavailability. *See* 77 Fed. Reg. 8724, 8727-28 (Feb. 15, 2012).

## III.     The Preexisting Regulatory Scheme Balanced the Government's Compelling Interest in the Seamless Provision of Contraceptive Coverage with Institutions' Religious Objections.

### A.     The Preexisting Exemption and Accommodation Were the Product of an Inclusive Deliberative Process.

47.     The regulatory scheme that preceded the Interim Final Rules was developed with the input of hundreds of thousands of public comments and ensured women's seamless and no-cost access to contraceptive services while respecting the beliefs of those who object to those services.

---

[42] Cynthia Cox, et al., Kaiser Family Foundation, *Examining High Prescription Drug Spending for People with Employer Sponsored Health Insurance* (Oct. 27, 2016), http://www.healthsystem tracker.org/brief/examining-high-prescription-drug-spending-for-people-with-employer-sponsored-health-insurance/#item-start.

[43] Adam Sonfield et al., *Impact of the Federal Contraceptive Coverage Guarantee on Out-of-Pocket Payments for Contraceptives: 2014 Update*, 91 Contraception 44, 46 (2015), http://www.contrace ptionjournal.org/article/S0010-7824(14)00687-8/pdf.

48.     The August 2011 IFR specified that group health plans sponsored by "religious employers"—namely houses of worship and their integrated auxiliaries—were *exempt* from the contraceptive coverage benefit, and that employees at these entities would have to pay for contraceptives out-of-pocket (or obtain insurance through alternative means).  76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011).  The Departments reasoned that the exemption for religious employers "reasonably balance[d] the extension of ... coverage of contraceptive services under the HRSA Guidelines *to as many women as possible*, while respecting the unique relationship between certain religious employers and their *employees in certain religious positions*." *Id.* (emphasis added).

49.     In response to the August 2011 IFR, the Departments received more than 200,000 comments, including requests to broaden the range of employers, institutions and plan sponsors eligible for the exemption.  77 Fed. Reg. at 8726.

50.     In February 2012, the Departments finalized the rule without change, stating that expanding the exemption "would subject [] employees to the religious views of the employer, limiting access to contraceptives, and thereby inhibiting the use of contraceptive services and the benefits of preventive care."  77 Fed. Reg. at 8728.

51.     The Departments, however, announced that they would develop an *accommodation* to address the religious objections of non-profit religious entities ineligible for the exemption.  Under the accommodation, "[c]ontraception coverage [would] be offered to women by their employers' insurance companies directly [and at no charge to women], with no role for [the] employers who oppose contraception."[44]  Institutions that qualified for the

---

[44] White House, Office of the Press Secretary, Fact Sheet: Women's Preventive Services and Religious Institutions, Feb. 10, 2012, https://obamawhitehouse.archives.gov/the-press-office/2012/02/10/fact-sheet-women-s-preventive-services-and-religious-institutions.

18

accommodation would not be required to "provide contraceptive coverage;" "refer their employees to organizations that provide contraception;" or "subsidize the cost of contraception."[45]

52.     After receiving more than 200,000 comments, the Departments proposed a rule defining organizations eligible for the accommodation as non-profit institutions that held themselves out as religious; opposed, on religious grounds, provision of contraceptive coverage; and self-certified as meeting those criteria. 78 Fed. Reg. at 8456, 8462 (Feb. 6, 2013).

53.     The Departments finalized this rule on July 2, 2013, after receiving more than 400,000 comments. 78 Fed. Reg. 39,870 (July 2, 2013). The Departments explained that the accommodation "promote[d] two important policy goals": *first,* it relieves eligible organizations from the obligation to "contract, arrange, pay, or refer for" contraceptive coverage, and *second*, it simultaneously ensures that the women who receive coverage under those entities' plans continue to have access to contraceptives with no cost-sharing, "advancing the compelling government interests in safeguarding public health and ensuring that women have equal access to health care." *Id.* at 39,872. The Departments considered and once again rejected requests to expand the exemption. *See id.* at 39,874.

54.     To sum up, the Departments have undertaken a balanced and deliberate approach in developing both the exemption and the accommodation over the past six years. From the perspective of objecting institutions, the difference between the *accommodation* and the *exemption* is that entities who qualify for the accommodation must notify their plan issuer or administrator of their objection to covering contraceptive services—or provide such notification to the Departments—while entities that qualify for the exemption need not do so.

---

[45] *Id.*

55.     But from the perspective of students or employees at an objecting institution through which they or their dependents receive health coverage, the difference could not be greater. Under the accommodation, students and employees retain seamless no-cost contraceptive coverage without imposing any cost on or requiring any involvement by the employers who invoke it; under the exemption, they are denied that coverage.

**B.     The Departments Modified the Accommodation in Response to Court Orders.**

56.     On June 30, 2014, the Supreme Court held that the Religious Freedom Restoration Act ("RFRA") compelled the Departments to extend the accommodation that it had developed for non-profit organizations with religious objections to providing contraception to closely-held for-profit corporations. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). In reaching this conclusion, the Court emphasized that extending the accommodation to closely-held corporate entities would have *no impact* on employees' ability to access contraceptives, as compared to employees of non-objecting employers. *Id.* at 2759-60; *see also id.* at 2786 (Kennedy, J., concurring) (noting that extending the accommodation to closely held for-profits would serve the government's compelling interest in protecting women's health without impinging on the plaintiffs' religious beliefs).

57.     Three days later, the Court issued an order establishing an alternative means by which Wheaton College, a non-profit that was already eligible for the accommodation, could avail itself of the accommodation. *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014). Instead of notifying its third-party plan administrator that it sought to claim the accommodation, the Court ordered that Wheaton College could notify HHS of its objection, and that HHS could then work directly with the administrator to separately arrange and pay for contraceptive coverage for Wheaton's students and employees.

58.     Thus, on August 27, 2014, the Departments issued a proposed rule to amend the definition of an "eligible organization" to align with the Supreme Court's ruling in *Hobby Lobby*. 79 Fed. Reg. 51,118 (Aug. 27, 2014).

59.     That same day, the Departments also issued an interim final rule to implement the *Wheaton College* order and make the same alternative notification mechanism available to other eligible organizations. 79 Fed. Reg. 51,092 (Aug. 27, 2014).  Accordingly, organizations eligible for the accommodation have multiple ways to avoid contracting, arranging, paying for, or otherwise facilitating their employees' or students' access to contraceptives.

60.     Almost a year later, on July 10, 2015, the Departments finalized these rules, stating that they "compl[y] with and go[] beyond what is required by RFRA and *Hobby Lobby*." 80 Fed. Reg. 41,318 (July 14, 2015).  These final rules took effect September 14, 2015, and have remained in effect until now. *Id.*

### C.     Objectors Continued to Challenge the Accommodation.

61.     Despite the Departments' extensive efforts to create an accommodation that respects objecting entities' religious beliefs while ensuring that women receive seamless access to contraceptive services, some non-profit organizations that were eligible for the accommodation filed legal challenges, arguing that the accommodation's notification requirement unlawfully burdened their religious exercise.  Eight of the nine U.S. Courts of Appeals that reviewed these challenges rejected them.[46]

---

[46] *Eternal Word Television Network v. Sec'y of U.S. Dep't of Health & Human Servs.*, 818 F.3d 1122 (11th Cir. 2016); *Dordt Coll. v. Burwell*, 801 F.3d 946 (8th Cir. 2015); *Mich. Catholic Conference v. Burwell*, 807 F.3d 738 (6th Cir. 2015); *Catholic Health Care Sys. v. Burwell*, 796 F.3d 207 (2d Cir. 2015); *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449 (5th Cir. 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606 (7th Cir. 2015); *Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422 (3d Cir. 2015); *Priests for Life v. U.S. Dep't of Health & Human*

62.     On May 16, 2016, the Supreme Court issued a *per curiam* opinion vacating and
remanding all of the circuit court decisions to give the parties an opportunity to develop an
approach that respects the plaintiffs' objections "while at the same time ensuring that women
covered by petitioners' health plans receive full and equal health coverage, including
contraceptive coverage." *Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (internal quotation
marks and citation omitted).

63.     The Departments subsequently sought comment to determine whether these cases
could be resolved by further modifying the accommodation. *See* 81 Fed. Reg. 47,741 (July 22,
2016). After receiving over 54,000 comments, including from the plaintiffs in *Zubik* and other
religiously-affiliated organizations, consumer groups, women's organizations, and health
insurers, among others,[47] the Departments concluded there was "no feasible approach [that] …
would resolve the concerns of religious objectors, while still ensuring that the affected women
seamlessly receive full and equal health coverage, including contraceptive coverage."[48]
Accordingly, they did not change the accommodation.

## IV.     The Interim Final Rules Drastically Change the Contraceptive Coverage Requirement Without Reasoned Justification.

64.     The Interim Final Rules took effect immediately upon publication in the Federal
Register on October 6, 2017. Although the Departments received hundreds of thousands of
comments for each of the previous rules relating to the contraceptive coverage requirement, they

---

*Servs.*, 772 F.3d 229, 237 (D.C. Cir. 2014); *but see Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151 (10th Cir. 2015).

[47] Dep't of Labor, FAQS About Affordable Care Act Implementation Part 36, 5 (Jan. 9, 2017), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf.

[48] *Id.* at 4.

permitted no public input on the Rules prior to their effective date, and did not observe the 30-day waiting period between publication and effective date.

65.     The Interim Final Rules upend the product of an exhaustive deliberative process that has been underway for roughly six years.

66.     First, the Rules expand the *exemption* that previously applied to a narrow set of "religious employers," such as churches and their integrated auxiliaries, to: (1) *all* non-profit and for-profit entities with religious objections, including publicly-held corporations; and (2) non-profit and closely-held for-profit entities with moral objections.  Employees and students who receive insurance through entities that invoke the broadened exemption will be denied seamless and cost-free access to contraceptive coverage.

67.     Second, the Rules make the accommodation *optional* and extend it to any organization with religious *or* moral objections to contraception.

68.     Third, the Rules no longer require institutions availing themselves of the now-optional accommodation to self-certify their eligibility.

69.     Fourth, the Rules permit insurers to make available insurance plans without contraceptive coverage to any individuals who object to contraception on moral or religious grounds.

70.     Together, these changes will prevent thousands of women from obtaining the no-cost contraceptive coverage to which they would otherwise be entitled.  As a result of the sweeping exemption created by the Rules, many women may be left with no choice but to purchase a health insurance plan that excludes coverage for a service that is critical to their health and well-being.  Thus, unlike the Departments' prior rules on contraceptive coverage, the

Rules frustrate the ACA's underlying goals of improving health and increasing access to preventive care.

71.     After repeatedly underscoring the need to balance the government's interest in advancing women's health and equality with the need to accommodate the religious beliefs of institutions that object to contraception, *see, e.g.*, 77 Fed. Reg. 8725, 78 Fed. Reg. 39870, 80 Fed. Reg. 41,318, the Departments now eschew that approach, instead choosing to privilege certain religious and moral ideologies, and in so doing, impose significant harms on women. The Departments offer no reasoned explanation for this reversal or for their decision to issue these Rules without an opportunity for the public to comment on them prior to their effective date. The Departments' abrupt decision to abandon the careful balancing approach previously taken is particularly troubling given that HRSA adopted the IOM's recommendations for women's preventive services (including all FDA-approved contraceptives) *in full*, and has not since rejected them. To the contrary, in December 2016, HRSA updated its women's preventive services guidelines and reaffirmed that women's preventive care should include the full range of FDA-approved contraceptives.

72.     Notably, President Trump has appointed several vocal opponents of contraception and family planning to key positions within the administration. For example, HHS Deputy Assistant Secretary for Population Affairs Teresa Manning, who oversees the Title X federal family planning program and helps sets national policy around family planning, contraception and teen pregnancy, has argued that the federal government should not be involved in providing family planning services.[49]  In a 2003 interview, she insisted that "contraception doesn't work,"

---

[49] Molly Redden, *Trump Set to Hand Key Family Planning Role to Anti-Contraception Advocate*, The Guardian (May 1, 2017, 12:56 EDT), https://www.theguardian.com/us-

claiming "its efficacy is very low, especially when you consider over years—which, a lot of contraception health advocates want to start women in their adolescent years, when they're extremely fertile, incidentally, and continue for 10, 20, 30 years . . . . [T]he prospect that contraception would always prevent the conception of a child is preposterous."[50]  In another interview, Manning stated that she opposes the use of IUDs because she believes, contrary to scientific evidence, that they effectively cause abortions.[51]

## V.    The Challenged Rules Will Harm Plaintiffs and Other Women Across the United States.

73.    Plaintiff Medical Students for Choice has chapters located at medical schools in 45 different states.  Among those medical schools are a number of religiously-affiliated institutions.

74.    Within the United States, there are over 200 Catholic colleges and universities that collectively educate more than 800,000 students, and provide insurance coverage to hundreds of thousands of employees and their families.  It is estimated that 1.5 million graduate and undergraduate students are covered under university health insurance policies.  76 Fed. Reg. 7767, 7768-69 (April 12, 2011).

---

news/2017/may/01/trump-teresa-manning-family-planning-role; Teresa Manning (Wagner) on family planning, https://www.c-span.org/video/?c4667783/teresa-manning-family-planning (last visited Oct. 10, 2017) (video clip).

[50] Redden, *supra* n.49; *see also* Excerpt of Teresa Manning (Wagner) interview on WBUR/NPR, https://soundcloud.com/user-549241470-208999232/teresa-wagner-theconnection-2 (last visited Oct. 10, 2017) (audio clip).

[51] Emily Bazelon, *New Soldiers for Trump's Anti-Abortion Army,* N.Y. Times, May 2, 2017, https://www.nytimes.com/2017/05/02/opinion/abortion-charmaine-yoest-teresa-manning.html?_r=0.

75.    In addition to its medical school members, Medical Students for Choice has over
3,500 member residents who are completing residency programs at hospitals across the nation,
including residents who are employed by religiously-affiliated hospitals.

76.    Many graduate student and resident members of Medical Students for Choice rely
on their student health plan or their employer's health plan to access contraception. Indeed, use
of birth control among medical students and residents is quite common, given the rigorous and
intensive work training that is involved. Many students and residents decide to prevent or defer
pregnancy in order to manage the demanding schedule of medical school and residency
programs.

77.    Members of Medical Students for Choice who attend school or complete their
residency training at religiously-affiliated institutions are at risk of losing their contraceptive
coverage.

78.    The University of Notre Dame encourages, but does not require, undergraduate
students to carry health insurance. All graduate and international students are required to have
health insurance coverage and are automatically enrolled in Notre Dame's student health plan.
The student health plan is administered by Aetna Student Health and covers approximately 2,700
individuals. The fee for the student health plan for the 2017-18 academic year is $2,265.[52]

79.    Health insurance for Notre Dame staff and faculty is administered by Meritain
Health. Approximately 11,000 individuals are covered under the university's employee plan.
Opinion & Order at 2, *Univ. of Notre Dame. v. Sebelius*, No. 3:12-CV-253RLM (N.D. Ind. Dec.
31, 2012), ECF No. 46.

---

[52] University of Notre Dame, University Health Services, Insurance Plans & Rates,
https://uhs.nd.edu/insurance-billing/insurance-plans-rates/

26

80. As explained on a University of Notre Dame FAQ webpage, individuals covered

under the student health plan are currently able to receive contraceptive coverage through the

existing accommodation, which is arranged for by Aetna Student Health:

> The University of Notre Dame honors the moral teachings of the Catholic Church.
> Therefore, for example, University Health Services may prescribe contraceptive
> medications to treat approved medical conditions, but not to prevent pregnancy. To
> comply with federal law, Aetna Student Health provides coverage for additional
> women's health products or procedures that the University objects to based on its
> religious beliefs. This coverage is separate from Notre Dame.[53]

81. Similarly, contraceptive coverage for Notre Dame staff and faculty under the

employee group health plan is separately arranged and paid for by Meritain Health:

> Notre Dame has certified that its group health plan qualifies for an accommodation
> with respect to the federal requirement to cover all Food and Drug Administration-
> approved contraceptive services for women, as prescribed by a health care provider,
> without cost sharing. This means your Notre Dame medical plan will not contract,
> arrange, pay, or refer for contraceptive coverage. Instead, Meritain Health will
> provide separate payments for contraceptive services that you use, without cost
> sharing and at no other cost, for so long as you are enrolled in the University's
> medical plans. Notre Dame will not administer or fund these payments. If you have
> any questions about this notice, contact Meritain Health.[54]

82. Prior to the enactment of the ACA, the University's health insurance plans

excluded coverage for contraception unless prescribed for non-contraceptive purposes. *See*

Opinion & Order at 1-3, *Univ. of Notre Dame. v. Sebelius*, No. 3:12-CV-253RLM (N.D. Ind.

Dec. 31, 2012), ECF No. 46. In December 2013—shortly before the effective date of the

regulations allowing religiously-affiliated entities like the University of Notre Dame to opt out of

the ACA's contraceptive coverage requirement via the accommodation—the University of Notre

Dame filed a lawsuit, claiming that the accommodation substantially burdens its exercise of

---

[53] University of Notre Dame, University Health Services, Insurance FAQs,
http://uhs.nd.edu/insurance-billing/insurance-faqs/#contraceptives.

[54] University of Notre Dame, Open Enrollment Decision Guide, 2018 Edition, 28,
http://hr.nd.edu/assets/213121/2017_18_decision_guide.pdf.

religion. *Univ. of Notre Dame. v. Sebelius*, 988 F. Supp. 2d 912 (N.D. Ind. 2013). As explained by the Seventh Circuit, Notre Dame argues that the mere act of certifying its religious objection to the third-party insurance companies that administer its health plans makes the University "complicit in the sin of contraception." *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 612-13 (7th Cir. 2015), *cert. granted and judgment vacated by Univ. of Notre Dame v. Burwell,* 136 S. Ct. 2007 (2016).

83.    In light of the University's long-standing objection to contraception, its failure to cover contraceptive services for faculty or students prior to the ACA, and its ongoing lawsuit challenging the accommodation, Plaintiffs Reifenberg and Doe are at risk of losing contraceptive coverage that they are otherwise entitled to under the ACA.

84.    The Interim Final Rules do not propose any alternative to ensure that women who receive health insurance through an exempted entity can access seamless contraceptive coverage. Rather, the Departments assert, without support, that these women can rely on public programs such as Title X or Medicaid.

85.    The Departments' proposed alternatives are simply unfeasible. These public programs do not provide no-cost contraceptives to all women. The vast majority of patients receiving services at Title X clinics have incomes at or below the federal poverty level and cannot otherwise afford private health insurance. Likewise, the Medicaid program is available only to low-income women. Many women whose employers or universities cease providing contraceptive coverage are likely to be ineligible for these public programs.

86.    In addition, these programs, even if available, fail to provide "seamless" coverage to women who otherwise obtain insurance through their employer or university. They would require a woman to enroll in a completely separate public program, demonstrate her eligibility,

and then locate a new healthcare provider, rather than being treated by the same healthcare provider she sees for all her other healthcare needs. Such additional obstacles would pose delays and may ultimately prevent women from obtaining the care they need.

87.     In sum, the Rules will deny many women the no-cost contraceptive coverage that they are entitled to under the ACA. This lack of coverage will decrease women's use of the most effective methods of contraception, impose unnecessary logistical obstacles and financial burdens, deprive women of educational and professional opportunities, harm the health of some women who rely on contraceptives for non-contraceptive benefits, and reduce the economic stability of women and their families.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

(Procedural Violation of the Administrative Procedure Act)

88.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 87.

89.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

90.     Absent a showing of good, cause, the APA requires an agency to follow notice and comment procedures which provide "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c). The APA further requires that a rule be published 30 days prior to its effective date. *Id.* § 553(d).

91.     The Interim Final Rules are final agency action and are legislative rules within the meaning of the APA.

92.     The Departments did not engage in notice and comment rulemaking before issuing the Interim Final Rules, did not observe the 30-day period between publication and effective date, and had no authority to disregard the APA's rulemaking requirements.

93.     Because the Rules were promulgated without adherence to the APA's procedural requirements, and without good cause for doing so, they violate 5 U.S.C. § 706(2).

## SECOND CLAIM FOR RELIEF

(Substantive Violations of the Administrative Procedure Act)

94.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 87.

95.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to a constitutional right," *id.* § 706(2)(B), or "in excess of statutory jurisdiction," *id.* § 706(2)(C).

96.     The Rules are invalid in violation of 5 U.S.C. § 706(2) because they are supported by no valid justification, contradict the ACA and the U.S. Constitution, and exceed Defendants' statutory jurisdiction, authority, or limitations.

97.     In particular, the Rules are contrary to Section 1557 of the ACA, 42 U.S.C. § 18116, which prohibits sex discrimination in certain health programs and activities. By permitting objecting institutions to deny coverage for contraceptives, and thus deny women essential health coverage, the Rules discriminate based on sex.

98.     The Rules are also contrary to Section 1554 of the ACA, which prohibits HHS from issuing regulations that "create[] any unreasonable barriers to the ability of individuals to obtain appropriate medical care." 42 U.S.C. § 18114(1). By permitting objecting institutions to deny no-cost contraceptive coverage, the Rules erect unreasonable barriers to medical care.

30

## THIRD CLAIM FOR RELIEF

(Establishment Clause)

99.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 87.

100.    The Rules promote the religious beliefs of objecting institutions, permitting those institutions to impose those beliefs on their employees and students.

101.    By granting objecting institutions the power to deny their employees and students coverage for contraception and thereby imposing substantial harms on these third parties, the Rules violate the Establishment Clause of the U.S. Constitution.

## FOURTH CLAIM FOR RELIEF

(Equal Protection Clause, U.S. Constitution)

102.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 87.

103.    By allowing objecting institutions to deny only certain *women*'s preventive health coverage—namely, coverage for contraceptives—the Rules discriminate based on sex.

104.    By perpetuating antiquated notions of women's role in society and gender stereotypes, the Rules discriminate based on sex.

105.    By singling out women for disfavored treatment in a manner that infringes the fundamental right to reproductive freedom, the Rules discriminate based on sex.

106.    The Rules target women for disfavored treatment without a sufficient justification, in violation of Plaintiffs' rights to equal protection under the Fifth Amendment of the U.S. Constitution.

31

## FIFTH CLAIM FOR RELIEF

(Right to Liberty, U.S. Constitution)

107.    Plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 through 87.

108.    By impairing women's ability to access contraception, and forcing women to

either incur significant costs or to forego contraception altogether, the Rules infringe the

fundamental right to liberty, in violation of Plaintiffs' rights under the Fifth Amendment of the

U.S. Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

1) Declare, pursuant to 28 U.S.C. § 2201, that the Interim Final Rules violate the Administrative Procedure Act; and/or

2) Declare, pursuant to 28 U.S.C. § 2201, that the Interim Final Rules violate the Fifth Amendment of the United States Constitution; and/or

3) Declare, pursuant to 28 U.S.C. § 2201, that the Interim Final Rules violate the First Amendment of the United States Constitution; and/or

4) Enter an injunction prohibiting Defendants, their employees, agents, and successors in office, from implementing or enforcing the Interim Final Rules; and

5) Award to Plaintiffs costs, expenses, and attorneys' fees pursuant to 28 U.S.C. § 2412; and

6) Grant such other and further relief as this Court should find just and proper.

DATED: October 10, 2017

Respectfully submitted,

Sara S. Zdeb (D.C. Bar #991065)
David J. Leviss** (D.C. Bar # 1003724)
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
szdeb@omm.com
dleviss@omm.com

Jennifer B. Sokoler*
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000
jsokoler@omm.com

Autumn Katz*
Hillary Schneller*
Madeline M. Gomez*
CENTER FOR REPRODUCTIVE RIGHTS
199 Water Street, 22nd Fl.
New York, NY 10038
(917) 637-3723
akatz@reprorights.org
hschneller@reprorights.org
mgomez@reprorights.org

Priscilla J. Smith*
YALE LAW SCHOOL, PROGRAM FOR THE
STUDY OF REPRODUCTIVE JUSTICE
319 Sterling Place
Brooklyn, NY 11238
(718) 399-9241
Priscilla.smith@yale.edu

*Application for admission *pro hac vice*
forthcoming

**Application for admission pending